UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------- x
UNITED STATES OF AMERICA,      :
     :
                Plaintiff,      :
     :     MEMORANDUM & ORDER
         -against-     :
     :     15-cr-377 (ENV)
ALEX SCHREIBER,      :
     :
                Defendant      :
------------------------------------------------------------- x

VITALIANO, D.J.

Defendant Alex Schreiber was charged in a two-count indictment with receipt and possession of child pornography, in violation of 18 U.S.C. §§ 2252(a)(2) and 2252(b)(1), and 2252(a)(4) and 2252(b)(2), respectively. On June 29, 2017, he moved to dismiss the indictment, arguing that the government engaged in "outrageous" conduct that violated his Fifth Amendment due process rights. For the reasons set forth below, the motion is denied.

### Background

The indictment arose out of a FBI investigation into a website, publically known as Playpen, in or around September 2014, which is when agents became aware that the site made available and did distribute child pornography. (Affidavit in Support of Application for a Search Warrant ("Macfarlane Aff."), 15-SW-89 (E.D. Va. Feb. 20, 2015), attached as Ex. A to Mem. of Law in Supp. of Def.'s Mot., ("Def. Mem.", Dkt. 22), Dkt. 22-1, ¶ 11.) In January 2015, FBI agents obtained and executed a search warrant permitting them to seize the Playpen server and move a copy of it to government facilities in Virginia.[1] (*Id*. ¶ 28.) While the seizure would

---

[1] For purposes of this motion only, all warrants obtained by the government in furtherance

1

normally have provided the government with important information as to the identity of Playpen visitors and their criminal activities, because the server was hosted on an anonymous network, The Onion Router ("Tor"), agents were unable to even identify who had visited the website much less discover their individual activities there.[2]  (*Id*. ¶ 29.)

Facing these investigatory challenges, on February 19, 2015, the FBI secured an additional search warrant for the home of Playpen's administrator in order to obtain operational control of the website. (*Id*. ¶ 30.) Then, rather than shut Playpen down, in order to continue the investigation, the FBI applied for a third warrant from a magistrate judge sitting in the United States District Court for the Eastern District of Virginia, for that purpose. (*Id*. ¶¶ 30, 31, 36.) Specifically, the warrant application sought permission to use a network investigative technique ("NIT") that would enable agents to download key identifying information about each computer that accessed Playpen, and, thereafter, prosecute individuals downloading or disseminating child pornography via the site. (*Id*. ¶¶ 33-36.) This strategy, however, required that FBI agents permit Playpen users to continue to post and download illicit images, including videos of children. (United States' Response to Order Compelling Discovery in *United States v. Michaud*, 15-cr-5351 (W.D.WA) ("*Michaud* Discovery Response"), attached as Ex. B to Def. Mem., Dkt. 22-2, at 2-3.) The magistrate judge granted the application and issued the warrant. Ultimately, the FBI allowed Playpen to operate from February 20 through March 4, 2015 – two weeks shy of the 30-day period sought in its application and permitted by the warrant. (*Id*. at 3.)

---

of the investigation are deemed valid.

[2] Essentially, Tor protects its user's privacy by masking his or her Internet Protocol ("IP") address and, thereby, preventing someone from discerning what sites the user visited and from identifying his or her physical location. (Macfarlane Aff. ¶ 8.)

It was through the use of these methods that FBI agents were able to identify Schreiber as an individual who downloaded child pornography from Playpen.  (Criminal Compl. ¶¶ 5-7.)

Discussion

I. <u>Controlling Law</u>

It is true, as the Supreme Court has observed, that there could be "a situation in which the conduct of law enforcement agents is so outrageous that due process principles would absolutely bar the government from invoking judicial processes to obtain a conviction." *United States v. Russell*, 411 U.S. 423, 431-32, 93 S. Ct. 1637, 1643, 36 L. Ed. 2d 366 (1973).  Lighting a cautionary lamp, the Second Circuit has explained further that "[t]o establish a due process violation on [the grounds of excessive government involvement in a crime], a defendant must show that the government's conduct is 'so outrageous that common notions of fairness and decency would be offended were judicial processes invoked to obtain a conviction.'" *United States v. Al Kassar*, 660 F.3d 108, 121 (2d Cir. 2011) (citation omitted).  In short, "the government's conduct must reach a demonstrable level of outrageousness before it could bar conviction." *United States v. LaPorta*, 46 F.3d 152, 160 (2d Cir. 1994) (citation and quotation omitted).  When facts make its application appropriate, this principle "ensur[es] that the government does not trample in an unconscionable manner on individual dignity." *United States v. Schmidt*, 105 F. 3d 82, 91 (2d Cir. 1997).

When application of this principle is demanded, it triggers an inquiry in which the focus rests on the conduct of the government agents, and not that of the defendant. *Al Kassar*, 660 F.3d at 121.  However, in light of the wide deference case law affords the government in choosing its investigatory method, defendants face a heavy burden in proving outrageous government conduct. *Id.*; *United States v. Rahman*, 189 F.3d 88, 131 (2d Cir. 1999).

Historically, government conduct found outrageous has involved "either coercion or a violation of the defendant's person." *Al Kassar*, 660 F. 3d at 121. This means that government agents must actually coerce, intimidate or use physical force on a defendant to rise to the appropriately shocking level to merit dismissing an indictment. *See Schmidt*, 105 F. 3d at 91-92 ("Ordinarily such official misconduct must involve either coercion . . . or violation of the defendant's person . . . When police do no more than facilitate a criminal enterprise started by another, due process principles are not violated."). Thus, even where government agents create the opportunity for the defendant to commit an offense through an "elaborate" ploy and with "extensive" "engagement with the defendant," such conduct is not sufficient to establish the kind of outrageous behavior that would warrant relief. *Al Kassar*, 660 F. 3d at 121; *Russell*, 411 U.S. at 432 (recognizing that government agents may be forced to infiltrate and, to an extent, even participate in criminal wrongdoing as part of an investigation); *United State v. Myers*, 692 F.2d 823, 837-43 (2d Cir. 1982) (finding that creating the opportunity to commit bribery, providing large cash bribes and coaching the defendant in how to commit the crime did not constitute outrageous government conduct); *Schmidt*, 105 F.3d at 85, 92 (holding that the government agents' action in posing as hit met, accepting the defendant's offer to murder prison guards and orchestrating a breakout did not violate due process). On the other hand, six days of intense interrogation to secure a confession, *Watts v. Indiana*, 338 U.S. 49, 55, 69 S. Ct. 1347, 1350, 93 L.Ed. 1801 (1949), and the forcible extraction of the defendant's stomach, *Rochin v. California*, 342 U.S. 165, 172, 72 S. Ct. 205, 209-10, 96 L. Ed. 183 (1952), were held to rise to the necessary level of outrageousness that violated due process.

Opening a new beachhead, the Second Circuit has since suggested that government conduct could be deemed "outrageous" if it violates the due process rights of *third parties*.

4

*United States v. Chin*, 934 F.2d 393, 399-400 (2d Cir. 1991). In practical terms, however, there appears to be very little beach, since "[a] necessary prerequisite for demonstrating that an undercover investigation violated the rights of third parties is proof that the governmental action actually caused the defendant to commit a crime that would otherwise not have been committed." *Id*. at 400. In that case, the court recognized that, in coaxing the defendant to travel to Amsterdam to purchase child pornography and to bring it back to the United States, the government "encouraged [the defendant] to go out and commit a *real* crime, with *real* victims." *Id*. at 399.[3] Notwithstanding the harm to the children depicted in the images, the court declined to order dismissal of the indictment when the defendant could not prove that the government's conduct actually caused him to commit the crime of transporting child pornography. *Id*. at 400.

Finally, in overarching guidance, case law directs that, if, in pursuing an investigation, a government agent engages in criminal conduct, the appropriate remedy is to hold the agent responsible, and not to dismiss the indictment against another alleged wrongdoer. Indeed, the Supreme Court has warned: "If the police engage in illegal activity in concert with a defendant beyond the scope of their duties the remedy lies, not in freeing the equally culpable defendant, but in prosecuting the police under the applicable provisions of state or federal law." *Hampton v. United States*, 425 U.S. 484, 490, 96 S. Ct. 1646, 1650, 48 L. Ed. 2d 113 (1976); *see also United States v. Chase*, No. 5:15-CR-00015-RLV-DCK-1, 2016 WL 4639182, at *2 (W.D.N.C. Sept. 6, 2016) (holding, in a parallel case against a Playpen user, that "the remedy for 'illegal activity' by

---

[3]   The Second Circuit stated that, in buying child pornography, the defendant increased its demand which "further[ed] the sexual exploitation of minors." *Chin*, 934 F.2d at 399. In fact, it is well-understood now that minors depicted in such images are re-victimized even in their adulthood every time such images are viewed. *See Paroline v. United States*, 134 S. Ct. 1710, 1717, 188 L.Ed.2d 714, 82 USLW 4294 (2014); *see also New York v. Ferber*, 458 U.S. 747, 759, 102 S. Ct. 3348, 3355, 73 L.Ed.2d 1113 (1982).

the police" was prosecution of the agent) (citing *Hampton*, 425 U.S. at 490).  In *Hampton*, although the petitioner claimed that government agents gave him the very same heroin for which he was later charged with selling to other government agents, the court found no due process violation when the police did not deprive the defendant of any right under the Constitution. *Hampton*, 425 U.S. at 489-91.

    II.    <u>The FBI's Conduct Was Not Outrageous</u>

As a starting point, to the Court's knowledge, every court presented with assertions that the FBI's conduct in allowing Playpen to operate under its aegis after Playpen's server had been seized constituted outrageous conduct has held that dismissal of the indictment on that ground was improper.  *See, e.g.*, *United States v. Kim*, 16-CR-191 (PKC), 2017 WL 394498 (E.D.N.Y. Jan. 27, 2017); *United States v. Cookson*, No. 17-10087-1-JTM, 2017 WL 5629678 (D. Kan. Nov. 22, 2017); *United States v. Eller*, No. 17-CR-30075-SMY, 2017 WL 4548419 (S.D. Ill. Oct. 12, 2017); *United States v. Ammons*, No. 3:16-CR-011-TBR, 2017 WL 4355670 (W.D. Ky. Sept. 29, 2017); *United States v. Barnes*, No. 3:15-CR-112, Dkt. No. 83 (M.D. Fla. May 8, 2017) (magistrate's report and recommendation, adopted in Dkt. No. 93); *United States v. Lueck*, No. 6:17-CR-008, Dkt. No. 56 (M.D. Fla. Apr. 12, 2017); *United States v. Libbey-Tipton*, No. 16-CR-236, Dkt. No. 31 (N.D. Ohio Apr. 3, 2017); *United States v. Pawlak*, 237 F. Supp. 3d 460 (N.D. Tex. 2017); *United States v. Tran*, 226 F. Supp. 3d 58 (D. Mass. 2016); *United States v. Vortman*, No. 16-CR-210, 2016 WL 7324987 (N.D. Cal. Dec. 16, 2016); *United States v. Hammond*, 263 F. Supp. 3d 826 (N.D. Cal. 2016); *United States v. Owens*, No. 16-CR-38, 2016 WL 7079617 (E.D. Wis. Dec. 5, 2016); *United States v. Tippens*, 16-CR-5110 (W.D. Wash. Nov. 30, 2016); *United States v. Anzalone*, 221 F. Supp. 3d 189 (D. Mass. 2016); *United States v. Allain*, 213 F. Supp. 3d 236 (D. Mass 2016); *Chase*, 2016 WL 4639182.  Daunting on its own,

moreover, the Second Circuit has never found that the government's involvement in a crime was so outrageous as to violate due process under any set of facts. *United States v. Heyward*, No. 10 Cr. 84(LTS), 2010 WL 4484642, at *3 (S.D.N.Y. Nov. 9, 2010). Noting presented in the facts here have suggested that the Court deviate from this well-blazed trail.

Not shrinking from the daunting task created by the mountain of case law against him, Schreiber persists in arguing that the FBI engaged in outrageous conduct by simply operating Playpen for a two-week period as an active child pornography site. (Def. Mem. at 1-2). To support his charge of outrageousness, Schreiber proffers his estimate that, during its operation of the website, the government itself distributed over 1 million images of child pornography, (Def. Mot. at 6), and that 100,000 Playpen users clicked 67,000 child pornography links (Def. Mot. at 5).[4] In taking this course of investigative action, Schreiber alleges that the government caused the re-victimization of the children who appeared in the links and amounted to an illegal distribution of child pornography in violation of the Adam Walsh Child and Safety Protection Act, 18 U.S.C. § 3509(m)(1), ("AWA"). (Def. Mot. at 10, 11.)

The defense fascination with the number of images distributed under FBI aegis, suggesting box car loads of images distributed with the attendant re-victimizations, conjuring up

---

[4] In coming to what he describes as a "reasonable estimate," Schreiber states that because the government "admitted that [it] distributed a minimum of 22,000 pictures, videos and additional links to child pornography" and because there were 1 million Playpen logins, there were likely 1 million pictures and videos distributed. (Def. Mem. at 6.) However, the government, stated only that 13,000 links were posted during the government's operation and that it could not "specify exactly how many images and videos were contained within each" link. (*Michaud* Discovery Response, at 2-3.) Based on this limited information, the Court cannot verify defendant's estimate. Nor, in the Court's view, does the war of estimates matter. A single viewing of a video of the vile sexual exploitation of children, comprised of thousands of images for guidelines purposes, is enough to make whatever point defendant's estimate was intended to make.

7

arguments most often associated with prosecutors and probation officers at the time of sentencing, makes plain that the crux of defendant's argument does not call upon the traditional notions of outrageous government conduct taken against his person. Rather, the argument charts a different course – the tack suggested by the Second Circuit in *Chin*: violations of the due process rights of a third party – the re-victimization of the children depicted in the images through fresh viewing of the images via the FBI's Playpen operation. Clearly, it is a tack Schreiber is forced to take since it would plainly be incongruous for him to claim that the government violated his person when he had no interaction with any agent conducting the investigation. *See Vortman*, 2016 WL 7324987, at *4 (finding that the FBI's conduct in operating Playpen was not outrageous when the agents "did not threaten, coerce, or prod [the defendant] to use Playpen"). In fact, the record reveals that Schreiber willingly registered a Playpen account on September 3, 2014, well-before the government assumed operational control of it. (Criminal Compl. ¶ 5.)

  What, in any event, is fatal to Schreiber's argument based upon re-victimization of the children depicted in the images is his failure to make any showing that the government "caused [him] to commit a crime that would otherwise not have been committed," as required under *Chin*. *See Chin*, 934 F.2d at 400. Playpen had been in operation months before the government seized administrative control with at least 158,094 members and 95,148 posts loaded on it. (Macfarlane Aff. ¶ 11.) Clearly, crimes were already being committed and defendant makes no argument and provides no evidence that there was something about the FBI's seizure and operation that *caused* him, or others, to access Playpen and share child pornography.[5] Finally,

---

[5]   My sister Judge, the Honorable Pamela K. Chen, has found that there was only "a minor,

8

with respect to Schreiber's own conduct, as noted above, he was already a Playpen user before the government took the reins. He fails to suggest, let alone offer proof, that his actions on the Playpen website changed in any material way as a result of the FBI assuming control of it.

Perhaps recognizing this weakness, Schreiber attempts to side-step *Chin* by arguing that he need not prove the agents caused him to download child pornography because the government itself violated child pornography laws by the continued exploitation of the seized site. (Def. Mot. at 10-12.) This last gasp is equally unavailing. First, it is not at all established that the government engaged in any illegality by passively operating the website. In a parallel criminal case concerning the FBI's operation of Playpen, the court in *Ammons* found that the defendant could not establish outrageous government conduct based on the contraband, seized by the government, that was accessible on Playpen when the government "engag[ed] in correspondence with defendants and conduct[ed] controlled deliveries of child pornography to them." *See Ammons*, 2017 WL 4355670, at *3. *Ammons* went on to reason that there was no violation of AWA because "the FBI never posted or distributed child pornography" and thus could not have "disseminat[ed] child pornography outside of the government." *Id.*, at *5; *see also Vortman*, 2016 WL 7324987, at *5 (stressing that "the government acted as a mere observer . . . the government did not distribute any child pornography, nor engage with Playpen's users"). *But see United States v. Tippens*, No. 3:16-cr-05110-RJB, at 8 (finding that the government "ignored" AWA and "facilitated the continued availability" of Playpen).

---

but inconclusive, increase in the number of users during the two weeks the FBI controlled the website," which did not prove that the distribution of child pornography that did occur during the government's control would not have occurred but for the government's operation of it. *See Kim*, 2017 WL 394498, at *7. Quite to the contrary, it suggested that the same level of distribution would have occurred under Playpen's own operation without government involvement.

9

Second, even if FBI agents violated laws by distributing, or aided and abetted the distribution of, child pornography, such criminal conduct alone would not compel the dismissal of the charges against Schreiber. *Barnes* observes that even if the government "by maintaining Playpen, violated the law it is charged with enforcing, the Supreme Court has made clear infiltration and limited participation in unlawful practices is a permissible means of investigation." *United States v. Barnes*, No. 3:15-CR-112, at 22 (M.D. Fla. May 8, 2017). *Barnes* went on to state that any violation should be remedied by prosecuting the agents, not dismissing the indictment. *Id.* Similarly, although the court in *Tippens* found that the government "ignored" AWA, it also found such conduct not dispositive on its own, concluding that the defendant had failed to establish outrageous government conduct warranting dismissal. *Tippens*, No. 3:16-cr-05110-RJB, at 8-10.

As the last card to be played, defendant contends that the FBI acted outrageously when it chose not to use alternative methods of apprehending Playpen users, which allegedly would not have caused the resulting harm to the imaged victims. Specifically, defendant asserts that the FBI could have posted dummy links with explicit titles, employed a "spoofing" system with a facsimile server without pornographic images or used virtual child pornography to catch Playpen users. (Def. Mot. at 15.) Although unsavory, the government's choice of investigatory methods merits deference and trumps the defendant's last card. In a more pointed and practical retort to this defense argument, the government proffers that such alternative methods may have uncovered investigatory leads, but would not have permitted the apprehension and prosecution of the website's users. (Government's Mem. of Law in Opp'n to Def.'s Mots. to Dismiss and Suppress, Dkt. 26, at 12.) Moreover, shutting down the website "would have frustrated agents' attempts to obtain information that could help identify and rescue child victims from ongoing

abuse." (*Michaud* Discovery Response, at 6.) Other courts considering this issue have agreed that alternative methods would have been less effective. *See Vortman*, 2016 WL 7324987, at *5 (accepting the government's assertions that other methods would have been ineffective at apprehending Playpen users); *Anzalone*, 221 F. Supp. 3d at 194 (agreeing that "significant changes to the site would tip off Playpen's users, making it more difficult to find and arrest them").

     Setting aside those solid practical reasons for investigatory defense, and even assuming there were alternative methods available, the government, in any event, is entitled to weigh the relative costs and benefits of the available array of investigatory approaches without being subject to judicial second guessing. *See Kim*, 2017 WL 394498, at *5 ("The FBI's weighing the costs and benefits of allowing the Playpen website to remain fully functional during the investigation is precisely the type of difficult decision-making that law enforcement must be allowed to make without undue second-guessing by the judiciary.") And, it is plain that, with respect to Playpen's operation, the government weighed the harms and proceeded in a manner that cannot be considered outrageous governmental conduct. Playpen was under 24-hour surveillance during the government's control whereby agents monitored and reported any perceived imminent harm to children. (*Michaud* Discovery Response, at 5.) In a comforting addition, the agents were proactive in their concern for victims. They held regular meetings to "assess whether the site should continue to operate" with their main focus on the victims' wellbeing. (*Id*. at 7.) When, after two weeks of operation, the government decided that the balance tipped in favor of shutting the website down, they did so. (*Id*.) In the end, as of January 2015, the government's investigation led to 137 individuals being charged with child pornography related crimes and 26 child victims recovered or identified. (*Id*. at 7-8.)

11

At bottom, the investigatory choice made by the government is cut from the same cloth guiding pursuit of narco-trafficking conspiracies. Federal agents will often allow the heroin wholesaler to continue distribution under their watchful eyes. Indeed, confidential informants may bring tax dollars to the naco-traffickers' front door that help fuel drug distribution. These drug traffickers then send heroin or other drugs out that same front door onto the streets where addicted victims gobble it up followed by overdoses and deaths just as night follows day – victims who might otherwise have survived but for the decision of agents to permit, or even facilitate the deadly sales they could have stopped. Consequently, while the Court does not grant the government's Playpen methods its *imprimatur*, neither will it impose its *interdictum*. As case law guides, the government must be left to conduct its investigations of child pornography as it deems best when, as here, its choice does not violate the due process rights of the defendant.

## Conclusion

Although the Court has expressed its concern about the government's use of an investigatory method that exposes the victims of child pornography to re-victimization, such conduct by the government cannot be considered so outrageous as to command dismissal of the indictment against Schreiber. The motion to dismiss the indictment is denied.

So Ordered.

Dated: Brooklyn, New York
       December 28, 2017

/s/ USDJ ERIC N. VITALIANO
ERIC N. VITALIANO
United States District Judge